IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CHRISTOPHER MOSLEY,                 §
                                    §
          Plaintiff,                §
                                    §
v.                                  §        CIVIL ACTION NO. H-07-1406
                                    §
ROADWAY EXPRESS INC.,               §
TEAMSTERS LOCAL UNION NO. 988,      §
INTERNATIONAL BROTHERHOOD OF        §
TEAMSTERS, and J.D. WILLIAMS,       §
in both his individual and          §
official capacities,                §
                                    §
          Defendants.               §


MEMORANDUM AND ORDER


     Pending is Defendant Teamsters Local Union No. 988 and

Defendant J.D. Williams's Motion for Summary Judgment (Document

No. 30), Defendant International Brotherhood of Teamsters's Motion

for Summary Judgment (Document No. 31), and Defendant Roadway

Express, Inc.'s Motion for Summary Judgment (Document No. 32).

After carefully considering the motions, response, replies, and the

applicable law, the Court concludes for the reasons that follow

that the motions should be granted.


I.  Background

     This is an employment dispute arising out of Plaintiff's

discharge by his employer, Defendant Roadway Express, Inc.

("Roadway").  Roadway is a motor carrier that transports freight

across North America.  Roadway has a terminal in Houston, and its

Houston employees are unionized and bound by the terms and conditions of a collective bargaining agreement ("CBA") executed by Roadway and the International Brotherhood of Teamsters ("International Union").   Document No. 32, ex. A ¶ 4 (Anthony Affidavit).

Plaintiff Christopher Mosley ("Mosley") alleges that he began his employment by Roadway on August 12, 2004.  Doc. No. 19, at 2. He worked as a casual dockworker and hostler at Roadway's Houston terminal.  As hostler, Mosley retrieved trailers that arrived at the terminal and moved them into the yard.  Document No. 32, ex. B at 25.  Mosley was a member of the Teamsters Local Union No. 988 ("Local 988"), the International Union's local branch.  Id., ex. B at 27-28.

Mosley received several written reprimands during his employment by Roadway.  *See* Documents No. 32, ex. B, Depo. Exs. 1-10.  In addition, Roadway discharged Mosley on three separate occasions--in April, July, and November of 2006.  Id., ex. B, Depo. Exs. 1, 10; Document No. 30, Tab 2 at 14.  After each discharge, Mosley filed grievances pursuant to the CBA and participated in grievance hearings before the Southern Region Multi-State Committee ("Grievance Committee").  The Grievance Committee reversed Mosley's first two discharges, and Mosley was reinstated both times. Mosley's third discharge and subsequent grievance hearing is the subject of this suit.

On November 26, 2006, a trailer containing plasma televisions worth nearly $100,000 was stolen from Roadway's Houston terminal. Id., ex. A ¶ 5 (Anthony Affidavit).  The thief gained access to the inside yard of the facility, stole a tractor, and hooked it to the trailer containing the televisions.  Id., ex. C ¶ 3 (Olivarez Affidavit).  Roadway's Service Team Manager, Ed Dvorak, hired Jamie Olivarez ("Olivarez"), a Security Investigator, to investigate the theft.  Id., ex. C ¶ 2-3.

Olivarez reviewed the various surveillance videos from the day of the theft.  Id., ex. C ¶ 4.  During the theft, two hostlers were on duty: Mosley and Larry Hammond ("Hammond").  Id., ex. C ¶ 4. According to Olivarez, "[t]he surveillance video and internal activity reports established that Hammond continued to make moves and perform his job duties as usual . . . during the time preceding the theft."  Id., ex. C ¶ 4.  In contrast, Olivarez "observed that Mosley performed **zero** moves during the time period directly preceding the theft."  Id., ex. C ¶ 4 (emphasis in original).  The following is Olivarez's summary of the surveillance videos:

- At 12:28 p.m. Mosley parked a single line tractor in a somewhat unusual location.

- At 1:35 p.m. Hammond moved the trailer containing the televisions to a staging area. . . . [and] Mosley made his final trailer move of the shift.

- At 1:41 p.m. a person is observed being dropped off and walking from the employee parking lot directly to the tractor that was parked by Mosley at 12:28 p.m.  The stranger climbed in and began driving the tractor.

3

- From 1:42 p.m. to 1:46 p.m., Mosley drove back and forth in front of the trailer that contained the plasma screen televisions. In fact, Mosley passed the trailer six times. I could not explain this bizarre behavior except to conclude that Mosley was highlighting the trailer's location.

- At 1:47 p.m. the tractor being driven by the thief is observed looking for the targeted trailer. Indeed, the thief goes back and forth several times presumably in an effort to find the target.

- At 1:54 p.m. the driver of the tractor had not located the targeted trailer. Mosley then drives his hostling unit to the area and pauses in front of the targeted trailer. Indeed, I concluded that while Mosley paused in front of the targeted trailer, a brief conversation took place between him and the thief. Soon after the thief driver is seen positioning in front of, and attaching to, the targeted trailer.

- At 1:59 p.m. the trailer pulls out of the staging area and out of the camera's sight.

- At 2:00 p.m. Mosley is seen entering the break-room. He scans the room and then makes a phone call on his cell phone. I conclude that Mosley was speaking to the thief.

- At 2:02 p.m. the driver of the stolen trailer is observed breaking through the exit gate.

Id., ex. C ¶ 4. After watching the surveillance footage, Olivarez interviewed several employees, including Mosley and Hammond. Id., ex. C ¶ 4. According to Olivarez, Mosley "became nervous" after Olivarez told him that the theft was recorded on video. Id., ex. C ¶ 5. Olivarez recounts the conversation as follows:

During this conversation Mosley gave nonsensical and inconsistent answers about his behavior on the day of the theft and was generally evasive. . . . [He] did not deny that he was the hostler featured in the surveillance video. Indeed, he attempted to explain his bizarre

4

> behavior in the video.  Specifically, Mosley admitted to
> moving the tractor used to steal the trailer in
> question [to an area] where it was not to be parked, and
> stated that he intended to use the tractor later in this
> shift.  This explanation did not make sense as he moved
> the tractor approximately half an hour before the end of
> his shift.

Id., ex. C ¶ 5.  Hammond, on the other hand, was "cooperative and calm during his interview."  Id., ex. C ¶ 6.  Based on "the fact that Mosley did none of his job duties while the theft was occurring, and his bizarre and nervous demeanor during questioning," Olivarez concluded that Mosley participated in the theft.  Id., ex. C ¶ 7.  Olivarez reported his findings to Roadway's Labor Relations Manager, Herb Anthony.  Id., ex. C ¶ 7 (Olivarez Affidavit); see also id., ex. A ¶ 5 (Anthony Affidavit).  Anthony watched the surveillance footage, and agreed with Olivarez's conclusion.  Id., ex. A ¶ 5-6 (Anthony Affidavit).

Anthony then met with three Local 988 representatives: Robert Mele, President; Kevin Adams, Chief Job Steward; and J.D. Williams ("Williams"), Business Agent.  Id., ex. A ¶ 6 (Anthony Affidavit).  Anthony told them that Roadway believed Mosley participated in the theft, and they all agreed to ask Mosley for his side of the story.  Id.  Adams called Mosley and asked him to attend a meeting that would be held on one of Mosley's off days, and asked him to bring his cell phone records to that meeting.  Id., ex. B at 142-44.  Adams told Mosley that while they wanted him to come, his attendance was not mandatory.  Mosley refused to come to the

5

meeting for three reasons: (1) it was his day off, (2) he had already spoken to Olivarez about the theft, and (3) he wanted to have his attorney present if he was being accused of participating in the theft. Id. Roadway terminated Mosley.

Mosley filed a grievance with the Local 988 pursuant to the CBA, disputing that he was involved in the theft. Id., ex. B at 77-78. Williams helped Mosley draft and file the grievance. Id., ex. B at 79. The hearing before the Grievance Committee was set for February 2007. In preparation for the hearing, Williams met with Mosley on multiple occasions, and helped Mosley prepare documents for the hearing. Document No. 30, Tab 2 at 14-15 (Mosley Affidavit), Tab 4 at 81 (Williams Affidavit). According to Mosley, however, Williams did not give him certain written evidence or the surveillance tapes as quickly as he would have liked. Id., Tab 2 at 200-202. In addition, during one phone conversation, Mosley recalls that Williams shouted and hung up on him. Id.

Pursuant to the CBA, the Grievance Committee consisted of union and Roadway representatives. Williams represented Mosley at the hearing, during which Williams made a brief statement on Mosley's behalf. Mosley describes Williams's statements as "fumbling." At the hearing, Mosley was given the opportunity to testify, and Williams called two witnesses who testified on Mosley's behalf. Document No. 32, ex. B at 125-26; Document No. 30, Tab 2 at 23. During the hearing, Mosley stated that

6

someone brought Williams a note "from Bob Davis," who is a Roadway representative.  Document No. 30, Tab 2 at 190-91.  Mosley suspects this note was a covert way of telling Williams that Mosley's discharge should be upheld.

Based on the evidence presented at the hearing, including Mosley's own testimony, the Grievance Committee upheld Mosley's discharge.  Id., Tab 3 at 79.  Mosley brings this suit alleging multiple claims against Roadway, the International Union, Local 988, and Williams.  Mosley alleges that Roadway, Local 988, Williams, and International Union (1) discriminated against him based on his race or national origin, (2)  breached their duty of fair representation, and (3) intentionally inflicted emotional distress upon him.  In addition, Mosley claims that Roadway (1) subjected him to a hostile work environment, (2) unlawfully retaliated against him for filing grievances after his April and July 2006 discharges, and (3) defamed him.  Each defendant now moves for summary judgment.

## II.  Discussion

### A.  Summary Judgment Standard

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interroga-tories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

7

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351). On the other hand, if "the

8

factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

To withstand a no-evidence motion for summary judgment, the nonmovant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 106 S. Ct. at 2552. If the nonmovant fails to make such a showing, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment must be granted. Id.

B.    Claims Against All Defendants

1.    Discrimination Claims against Roadway

Roadway contends that Mosley's claims for race and national origin discrimination under Title VII and § 1981 fail because (1) he cannot establish a *prima facie* case of discrimination, and (2) even if he could, he cannot show that Roadway's nondis-criminatory reason for firing him is pretextual.[1]   Intentional

---

[1] Title VII proscribes an employer from discriminating against an individual because of that individual's race.   42 U.S.C.

discrimination can be established through either direct or circumstantial evidence. <u>Wallace v. Methodist Hosp. Sys.</u>, 271 F.3d 212, 219 (5th Cir. 2001). Because Mosley presents no direct evidence of discrimination, his claim must be analyzed using the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 93 S. Ct. 1817 (1973). Under this framework, the plaintiff must first create a presumption of intentional discrimination or retaliation by presenting evidence of a *prima facie* case. *See* <u>Davis v. Dallas Area Rapid Transit</u>, 383 F.3d 309, 317 (5th Cir. 2004). The burden then shifts to the employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for the underlying employment action. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 120 S. Ct. 2097, 2106 (2000). The burden on the employer at this stage "is one of production, not persuasion; 'it can involve no credibility assessment.'" <u>Id.</u> (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 113 S. Ct. 2742, 2748 (1993)). If the employer sustains its burden, the inference of discrimination or retaliation falls away, and the burden shifts back to the plaintiff to establish that the employer's proffered reason is merely a pretext for discrimination or retaliation. *See* <u>Davis</u>, 383 F.3d at 317.

§ 2000e-2(a)(1). "Section 1981 is a parallel remedy against discrimination which may derive its legal principles from Title VII." <u>Blum v. Gulf Oil Corp.</u>, 597 F.2d 936, 938 (5th Cir. 1979); *see* 42 U.S.C. § 1981. Where, as here, the same facts underlie the foregoing causes of action, the plaintiff's claims are analyzed conjunctively. *See* <u>Roberson v. Alltel Info. Servs.</u>, 373 F.3d 647, 651 (5th Cir. 2004).

a.   Mosley's *Prima Facie* Case of Discrimination

To establish a *prima facie* case of discriminatory discharge, Mosley must show that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class, or others similarly situated received disparate treatment. *See* Wheeler v. BL Dev. Corp., 415 F.3d 399, 406 (5th Cir. 2005); Okoye v. Univ. of Tex. Hous. Health Sci. Ctr., 245 F.3d 507, 512-13 (5th Cir. 2001). Roadway asserts that Mosley cannot establish a *prima facie* case because he cannot establish the fourth element--that he suffered disparate treatment compared to non-African-Americans.[2]

"To establish disparate treatment, a plaintiff must demonstrate that a 'similarly situated' employee under 'nearly identical' circumstances, was treated differently." Wheeler, 415 F.3d at 405 (citing Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995)). This standard is strictly construed. Okoye, 245 F.3d at 514-15. The Fifth Circuit has consistently found that employees with different responsibilities, different supervisors, different capabilities, different work rule violations, or different disciplinary records are not considered to be "nearly identical."

---

[2]  There is no evidence that Mosley was replaced by a non-African-American employee.

Mosley asserts that he suffered disparate treatment because he was fired for stealing the trailer while the Caucasian hostler on duty the night of the theft--Larry Hammond--was not.  Document No. 36 at 10.  The uncontroverted summary judgment evidence, when viewed in the light most favorable to Mosley, establishes that Hammond and Mosley were not in "nearly identical circumstances." In fact, the uncontroverted evidence is that during the critical time period surrounding the theft, Hammond's behavior on the job was not at all similar to Mosley's behavior on the job, and their conduct was also entirely different during the investigation of the theft that followed.  According to investigator Olivarez, the surveillance video from the night of the theft "established that Hammond continued to make moves and perform his job duties as usual after moving [the trailer that was later stolen] and during the time preceding the theft."  Document No. 32, ex. C ¶ 3-4 (Olivarez Affidavit).  In contrast, Olivarez found that "Mosley performed **zero** moves during the time period directly preceding the theft," and that his work behavior preceding the theft was "bizarre."  <u>Id.</u> (emphasis in original).  Moreover, Olivarez reported that when he interviewed Mosley, Mosley exhibited "bizarre and nervous demeanor during the questioning," and provided "generally evasive" answers, some of which "did not make sense."  <u>Id.</u>, ex. C ¶ 5, 7.  Hammond, on the other hand, was "cooperative and calm during his interview." <u>Id.</u>, ex. C ¶ 6.

12

Mosley does not refute that he was not performing job duties when the trailer was stolen or that he refused to cooperate in the investigation.   Rather, Mosley argues that his behavior was *justified* because (1) he was not working when the theft occurred because no one assigned him a task, and (2) he did not cooperate during the investigation because he "was rightfully concerned that he may be railroaded as a criminal suspect."   Document No. 36 at 10.   Mosley's explanation for his behavior is not the test.   The test is whether the conduct of Mosley and Hammond was nearly identical during the period in question.

The Fifth Circuit has stated that "the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." Wallace, 271 F.3d at 221 (citing Wyvill v. United Cas. Life Ins. Co., 212 F.3d 296, 304-05 (5th Cir. 2000)) (holding that the plaintiff who was fired, *inter alia*, for falsifying a patient's records failed to show disparate treatment because she could not point to another nurse who falsified records); *see also* Okoye, 245 F.3d at 514-15 (holding that the plaintiff-physician was not similarly situated to other physicians employed under the same contract because those physicians, unlike the plaintiff, were not accused of assaulting a co-worker); Amezquita v. Beneficial Tex., Inc., 264 F. App'x. 379, 385-386 (5th Cir. 2008) (analyzing the

plaintiff's claim that she suffered disparate treatment because she was a woman based on the fact that she was fired for having a sexual relationship at work while her male counterpart was merely demoted, and holding that the plaintiff was not similarly situated to her male co-worker, *inter alia*, because uncontroverted evidence proved that the employer felt the plaintiff was dishonest during its investigation into their illicit affair, while the male co-worker was not).  Likewise, Mosley has failed to establish that his and Hammond's behaviors and conduct were nearly identical on the night of the theft, and he has therefore failed to establish a *prima facie* case that Roadway discriminated against him because of his race.

      b.   <u>Roadway's Legitimate, Non-Discriminatory Reason and Mosley's Evidence of Pretext</u>

Even if Mosley had established a *prima facie* case of race discrimination, however, he has presented no proof to rebut Roadway's proffered legitimate, non-discriminatory reason for its decision to terminate him.  Roadway asserts that it discharged Mosley because it believed that Mosley was involved in the November 2006 theft.  Its belief was based on the surveillance footage, the fact that Mosley refused to explain his conduct, and the independent findings of Olivarez.  Document No. 31, ex. A ¶ 5, 6.

Mosley asserts that Roadway's reason is pretextual by challenging Roadway's and Olivarez's characterizations of the

14

surveillance footage and by providing excuses for his conduct during the theft and the subsequent investigation. Specifically, Mosley asserts that the "the videos of the yard, from any angle, are unclear at best," and that the timestamps on the videos were inconsistent. Document No. 36 at 13 n.16. In addition, Mosley argues that he was not working while the theft occurred because no one assigned him a task, and that he did not cooperate during the investigation because he was concerned that Roadway was going to charge him with criminal theft. Document No. 36 at 10.

Mosley, however, "cannot survive summary judgment simply by denying or explaining [his] alleged deficiencies." Ramirez v. Gonzalez, No. 06-40751, 2007 WL 329207, at *3 (5th Cir. 2007). The proper inquiry is "whether [Roadway]'s *perception* of [Mosley's] performance, accurate or not, was the real reason for [his] termination." Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 408-409 (5th Cir. 1999) (emphasis in original); *see also* Laxton v. Gap Inc., 333 F.3d 572, 579 (5th Cir.2003) ("[The inquiry] is not whether [the employer]'s proffered reason was an incorrect reason for [the discharge]."). Title VII does not protect an employee against unfair employment decisions; instead, it protects against employment decisions based upon discriminatory animus. Nieto v. L & H Packing Co., 108 F.3d 621, 624 (5th Cir. 1997). Put another way, the critical issue is not whether Mosley did in fact participate in the theft; rather, the issue is whether Roadway

15

fired Mosley because it *believed* he participated.   *See* <u>Bryant v.</u> <u>Compass Group USA Inc.</u>, 413 F.3d 471, 476-77 (5th Cir. 2005) (stating that the "critical issues" are not whether the plaintiff did in fact steal the employer's property and confess to the investigating officer; rather, the issues are what the officer relayed to the employer and whether the employer relied on that information in terminating the plaintiff).

Mosley provides no evidence that Roadway had not concluded at the end of its investigation that Mosley was involved in the theft. Moreover, he admits to the essential facts regarding his conduct at the time of the theft and to his not cooperating in a subsequent investigation, all of which formed the basis for Roadway's conclusion that Mosley was involved in the theft.  Document No. 36 at 10.  Mosley has failed to raise a fact issue that Roadway's reason for firing him was pretextual.

### 2.   <u>Discrimination Claims against Local 988 and Williams</u>

Mosley asserts that Local 988 and Williams racially discriminated against him by failing properly to investigate his termination and properly represent him in his hearing in front of the Union Grievance Committee.  Mosley's purported race discrimination claim fails as a matter of law because Plaintiff has no evidence that Local 988 or Williams discriminated against him.

16

To establish a *prima facie* case of race discrimination, Mosley must show, *inter alia*, that he suffered disparate treatment compared to non-African-Americans.  *See* <u>Wheeler</u>, 415 F.3d at 405. Mosley was the only employee fired for stealing the trailer, so he was the only employee that appeared before the Grievance Committee.[3]  Because Mosley failed to show that a similarly situated, non-African-American employee received better treatment from Local 988 and Williams, Mosley cannot establish a *prima facie* case of race discrimination, and Local 988 and Williams are entitled to summary judgment on this claim.

### 3. <u>Discrimination Claims against International Union</u>

Mosley apparently asserts a race discrimination claim against International Union.  International Union moved for summary judgment on the discrimination claim, *see* Document No. 31 at 8, and Mosley failed to defend such a claim in his response.  Undefended claims may be regarded as abandoned.  *See, e.g.*, <u>Scales v. Slater</u>,

---

[3] Indeed, Mosley admitted at his deposition that he could identify no other employees that received better representation:

    Q:   Well, I mean, I know for [Williams] to represent
         [sic] other people better than what [sic] he
         represented me.

    A:   Okay.  Like who?

    Q:   I don't know everybody by name or whatever, . . .

Document No. 30, Tab 2 at 34 (Mosley Depo.).

17

181 F.3d 703, 708 n.5 (5th Cir. 1999) (noting that the plaintiff abandoned her disparate impact claim in district court when she neither contested defendant's arguments for dismissal of that claim nor suggested that her statistical evidence demonstrated pretext); Thompson v. Exxon Mobil Corp., 344 F. Supp. 2d 971, 976 (E.D. Tex. 2004) (holding that where the defendant fully briefed all of plaintiffs' claims on summary judgment, and plaintiffs only responded on two claims, plaintiffs were deemed to have abandoned their remaining claims).  Thus, International Union is entitled to summary judgment on this claim.

    4.    Duty of Fair Representation

    Defendants Roadway, Local 988, Williams, and International Union move for summary judgment on Mosley's hybrid § 301 claims.[4] Hybrid § 301 suits are defined as follows:

> [H]ybrid suits formally comprise two causes of action.
> First, the employee alleges that the employer violated
> [section 301 of the Labor Management Relations Act] by
> breaching the collective-bargaining agreement.  Second,

---

    [4] Mosley's "Breach of Contract" cause of action asserts that Defendants breached the CBA.  Document No. 19 at 8-9.  Claims for breach of a CBA are preempted by the Labor Management Relations Act ("LMRA").  Avco Corp. v. Aero Lodge No. 735, Int'l Assn. of Machinists, 88 S. Ct. 1235, 1237 (1968) (holding that a state action for breach of contract, where the contract in question was a collective bargaining agreement, was preempted by section 301 of the LMRA).  Thus, although Mosley's "failed to allege a valid state law claim, [he] did state a federal claim under § 301 of the LMRA." Greene v. Asset Protection & Sec. Servs., Inc., No. Civ.A. B-06-63, 2006 WL 1407216, at *2 (S.D. Tex. May 18, 2006).

the employee claims that the union breached its duty of
fair representation . . . by mishandling the ensuing
grievance-and-arbitration proceedings.

To prevail on a hybrid § 301 action, the employee must prove both
that (1) the union breached its duty of fair representation, and
(2) the employer discharged him in violation of the CBA.  Thomas v.
LTV Corp., 39 F.3d 611, 621-22 (5th Cir. 1994) (stating that the
union's breach of duty of fair representation is "the
'indispensable predicate' for a section 301 action against an
employer, based on a violation of a collective-bargaining
agreement.").  Employees may assert a hybrid § 301 claim against
their employer, union, or both.  Id. at 621.[5]  First to be
considered is whether Local 988 breached its duty to Mosley.

In determining whether a union breached its duty of fair

---

[5] An employee, however, cannot assert a hybrid § 301 claim for
damages against an individual union representative.  Smith v. Am.
Postal Workers Union, No. 08-40631, 2009 WL 62245, at *1 n.2 (5th
Cir. 2009) (citing Atkinson v. Sinclair Refining Co., 82 S. Ct.
1318, 1324 (1962)).  Thus, Mosley's hybrid § 301 claim against
Williams will be dismissed.

Nor can Mosley assert such a claim against International
Union.  An international union owes no duty of fair representation
unless it was the employee's exclusive bargaining agent.  See,
e.g., Encina v. Tony Lama Co., 316 F. Supp. 239, 245 (W.D. Tex.
1970) ("The duty of fair representation is not imposed upon the
International Union which is not the exclusive bargaining
agency."), aff'd, 448 F.2d 1264 (5th Cir. 1971); accord Sinyard v.
Foote & Davies Div. of McCall Corp., 577 F.2d 943, 947-948 (5th
Cir. 1978).  Mosley concedes that Local 988, not International
Union, was his exclusive bargaining agent.  Document No. 36 at 6.
Thus, the claim against International Union will also be dismissed.
See Sinyard, 577 F.2d at 948.

representation, it "must be given certain latitude in resolving how the investigation and processing of a grievance is to be conducted. The legal question is not whether the employee is satisfied with the representation . . . or whether it was perfect." Hart v. Nat'l Homes Corp., 668 F.2d 791, 794 (5th Cir. 1982).  After all, the "union representative is not a lawyer and he cannot be expected to function as one." Freeman v. O'Neil Steel, Inc., 609 F.2d 1123, 1127 (5th Cir. 1980).  A plaintiff cannot show breach merely by proof that the underlying grievance was meritorious, or that the union's conduct in handling the grievance was negligent, careless, inadvertent, or mistaken. Hinton v. Teamsters Local Union No. 891, 818 F. Supp. 939, 942 (N.D. Miss. 1993) (citing Vaca v. Sipes, 87 S. Ct. 903, 919 (1967) and Coe v. United Rubber Workers, 571 F.2d 1349, 1350-51 (5th Cir. 1978)).  Instead, a union breaches its duty of fair representation only when "the union's conduct is 'arbitrary, discriminatory, or in bad faith,' or that the union discharged its duties in a perfunctory manner." Grovner v. Ga.-Pac. Corp., 625 F.2d 1289, 1290 (5th Cir. 1980) (quoting Vaca, 87 S. Ct. at 910) (internal citation omitted).

Mosley asserts five arguments in support of his contention that Defendants breached their duty of fair representation.

> (1)  "Local 988 and Williams were poorly prepared [for the hearing before the Grievance Committee]" and that Williams's performance at the hearing was "fumbling."

(2) Williams was delinquent in turning over evidence to be presented at the hearing.  Specifically, Mosley avers that Williams did not turn over all written paperwork about his grievance until Mosley made multiple written requests for it, and that he was not given a copy of the surveillance videos until twelve days before the Grievance Committee hearing.

(3) During one phone conversation, Williams yelled at him and hung up the phone.

(4) Someone brought Williams a note during the hearing, saying it was "from Bob Davis," a Roadway employee. Mosley avers that he saw the letters "DISC" on the note, which he believes represented "discharge."  According to Mosley, this indicates that Roadway and Williams were conspiring against him.

(5) Williams told Mosley not to produce his phone records to Roadway, even after Mosley told him that they contained potentially exculpatory evidence.

Reading this evidence in the light most favorable to Mosley, Mosley has failed to raise a fact issue regarding his claim for breach of duty of fair representation.  Mosley's first allegation--that Williams's preparation for and performance during the hearing was incompetent--is merely a claim of negligence.  Assuming in hindsight that Williams could have done more to prepare for the Grievance Committee hearing, "that is not the touchstone of a claim that the [u]nion's duty of fair representation has been breached." Hinton, 818 F. Supp. at 942.  Here, Williams helped Mosley draft his grievance, and he met with Mosley on multiple occasions in preparation for the hearing.  At the hearing, Williams made a brief statement, he called Mosley to testify in his own behalf to give his innocent explanations of his conduct and actions that were

captured and viewed on the surveillance videos, and Williams called two additional witnesses to vouch for Mosley.  Indeed, at the end of the hearing, Mosley confirmed that he "had ample opportunity to present any and all evidence that [he felt was] pertinent to [his] case."  Document No. 30, Tab 3 at 79.  Williams's conduct presented on this summary judgment record cannot fairly be described as bad faith, arbitrary, discriminatory, or perfunctory.  *See* Gilreath v. Clemens & Co., 212 F. App'x 451, 460 (6th Cir. 2007) (noting that the union's conduct was not perfunctory where it spoke with the plaintiff extensively about his concerns, visited the plaintiff's former employer, and filed a grievance on the plaintiff's behalf); Martin v. Am. Airlines, Inc., 390 F.3d 601, 607 (8th Cir. 2004) (holding that the union did not, as the plaintiff contended, give his case "only cursory attention" when it (1) reviewed relevant documents, (2) discussed the case with the employer's management representatives, (3) discussed strategy with the plaintiff, and (4) asked the employer to reinstate the plaintiff).  Indeed, Williams's representation of Mosley fits within the bounds of what the Fifth Circuit has found to evidence *good faith*.  *See* Connally v. Transcon Lines, 583 F.2d 199, 203 (5th Cir. 1978) ("The Union saw to it that the facts (which were relatively simple in nature) were presented on plaintiff's behalf before each and every one of the hearing panels and committees . . . . [The union's] repeated efforts on plaintiff's behalf constitute compelling evidence of

good faith and lack of perfunctory treatment." (quoting <u>Hensley v.</u>
<u>United Transps., Inc.</u>, 346 F. Supp. 1108, 1115 (N.D. Tex. 1972))).

Likewise, Mosley's second allegation--that Williams was
dilatory in turning over evidence--does not show a breach of duty
of fair representation. In <u>Grovner</u>, the Fifth Circuit held that
the union did not breach its duty by *failing to turn over* a hearing
transcript, which the plaintiff claimed was "essential" adequately
to prepare his brief following the hearing. *See* <u>Grovner</u>, 625 F.2d
at 1290-91. Here, in contrast, Williams obtained and provided to
Mosley in advance of the hearing *all of the evidence he requested*,
and Mosley's complaint is directed only to the promptness of that
delivery. The delay, while perhaps irritating or inconvenient for
Mosley, is not sufficient to raise a fact issue that he was denied
fair representation by Williams and Local 988.

Mosley's third allegation is that Williams yelled at him and
hung up the phone during a phone conversation. A similar argument
was rejected by the Seventh Circuit in <u>McKelvin v. E.J. Brach</u>
<u>Corp.</u>, 124 F.3d 864, 867-69 (7th Cir. 1997). In that case, the
plaintiff, McKelvin, asserted that his union representative, Mr.
Rhodes, acted with bad faith because he got angry at him and told
management that he was being insubordinate. The court found the
following:

> McKelvin has offered no evidence suggesting that Rhodes'
> anger affected his representation . . . . Indeed, the
> evidence suggests that Rhodes followed every prescribed

procedure in McKelvin's case.  He called a meeting with
management    to    seek    McKelvin's    reinstatement,    he
instructed McKelvin on the most advantageous way to
conduct  himself  at  the  meeting  (quietly),  he  showed
McKelvin how to file a grievance, he put the grievance
into proper form when McKelvin failed to do so, he filed
the grievance, and he sent McKelvin's case to the union's
attorney after the grievance had been denied. *There is
not a single responsibility that Rhodes failed to perform
in his representation of McKelvin*.

Id. at 868-69 (emphasis added).  Accordingly, the Seventh Circuit

found that the union had not breached its duty to McKelvin.  Id. at

869.  Similar to the union representative in McKelvin, Williams

obtained from company management its evidence against Mosley, he

helped Mosley draft his grievance, and he filed the grievance.

Moreover, Williams represented Mosley at the hearing before the

Grievance Committee.  Indeed, "[t]here is not a single responsi-

bility that [Williams] failed to perform . . . ."  McKelvin, 124

F.3d at 868.  The mere fact that Williams became angry with Mosley

on one occasion is not sufficient to raise a fact issue that he

breached  his  duty  to  provide  fair  representation  for  him,

especially in light of the summary judgment evidence related above

outlining  Williams's  representation  of  Plaintiff,  and  in  the

absence of any evidence that his anger on one occasion affected in

any way his actual representation of Plaintiff.  *See* id.; *see also*

Konen v. Int'l Bhd. of Teamsters, 255 F.3d 402, 408 (7th Cir. 2001)

("But  the  fact  that  [the  union  representative]  may  have  been

angry  with  [plaintiff]  does  not  support  an  inference  of  bad

24

faith because [plaintiff] has offered no evidence suggesting that [the representative]'s anger affected his representation of [plaintiff].").

Mosley's fourth argument--that the note he believes was given to Williams during the hearing evidences that Williams was conspiring with Roadway--fails for substantially the same reason. Whether Williams failed properly to represent Mosley at the hearing depends on whether his performance was "'arbitrary, discriminatory, or in bad faith, so that it undermined the fairness [of the hearing].'" Moore v. Potter, 275 F. App'x 405, 409 (5th Cir. 2008) (quoting Landry v. The Cooper/T. Smith Stevedoring Co., 880 F.2d 846, 852 (5th Cir. 1989)). Even if the Court were to accept Mosley's belief that the letters "DISC," which he saw on the note, stood for "discharge," Mosley fails to proffer any evidence that the note influenced Williams's representation or affected the outcome of the hearing itself. As previously stated, Williams called all the witnesses Mosley wanted to speak on his behalf, including Mosley himself, and at the end of the hearing Mosley confirmed that he "had ample opportunity to present any and all evidence that [he felt was] pertinent to [his] case." Document No. 30, Tab 3 at 79.

Fifth and finally, Mosley asserts that Williams told him not to produce his phone records after Mosley suggested that they could exonerate him. This allegation directly contradicts Mosley's prior

deposition testimony, where he said that *he chose* not to bring the records to protect his co-workers.  It is well settled that a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony." <u>Albertson v. T.J. Stevenson & Co., Inc.</u>, 749 F.2d 223, 228 (5th Cir. 1984).  Mosley claims in his summary judgment affidavit that when he arrived:

> at my grievance hearing in Florida, I informed Williams that I had brought the telephone records previously requested of me in hopes that they would exonerate me. Williams told me not to produce them and told me that it would only be necessary to produce them if I was under indictment.

Document No. 36, ex. 4 ¶ 7.  Previously, however, Mosley gave under oath in his oral deposition a totally different explanation for not producing his phone records to the union or as evidence in the case, and with no mention whatever of Williams:

> Q:    At least twice the union asked in writing for you to provide any written documents, any written evidence, that you had in support of your case; isn't that correct?
>
> A:    Yes.  And which I did.
>
> Q:    Did you provide the union with your phone records?
>
> A:    No.  They didn't ask for them.
>
> Q:    Well, did you volunteer your phone records to prove that you had been talking to your wife, as you said you had, during the videotape of you being in the break room and talking on your cell phone?

26

     A:   No.  And, I mean, the reason -- another reason for that is because of the people that I know keep people from getting harassed by Roadway that I was talking to on the phone.  Because they -- like, St. Julian and Anthony Bruno, they catching a lot of heat right now.  And that's why I kept my phone record undisclosed, because of how the company and some people in there are all about people talking and knowing this person or that person.  They use that against them, and they get on them.  They may harass them and do different things of that nature.

     Q:   You made the decision not to present your phone records as evidence in this case; is that correct?

     A:   Right.

     Q:   For the reasons you've stated.

     A:   Right.

Document No. 32, ex. B at 166-67.  Mosley has offered no explanation for the contradictory statement contained in his affidavit on why he did not produce his phone records.  Mosley's contradictory affidavit therefore cannot overcome his prior sworn testimony and cannot defeat summary judgment.  <u>Albertson v. T.J. Stevenson & Co., Inc.</u>, 749 F.2d 223, 228 (5th Cir. 1984).

In sum, Mosley has not raised a genuine issue of material fact that Local 988 breached its duty fairly to represent Mosley. Because breach of the duty of fair representation is an "indispensable predicate" to Mosley's hybrid § 301 claim, Local 988 and Roadway are entitled to summary judgment on the hybrid claim.

5.   <u>Intentional Infliction of Emotional Distress Claim</u>

Mosley also asserts a claim against "Defendant," without specifying any particular Defendant, for intentional infliction of emotional distress.  Document No. 19 at 10-11.  He also fails to specify any particular act that was intended to cause him emotional distress.  *See* <u>id.</u>  Instead, Mosley merely incorporates *all* of the factual allegations in his complaint as the basis for his claim. *See* <u>id.</u>  Regardless, in response to the pending motions for summary judgment, Mosley has failed to proffer any evidence that any defendant intentionally or recklessly engaged in conduct that was extreme and outrageous.

To establish a claim for intentional infliction of emotional distress in Texas, a plaintiff must show that: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.  <u>Std. Fruit & Veg. Co. v. Johnson</u>, 985 S.W.2d 62, 65 (Tex. 1998).  Conduct is extreme and outrageous only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  <u>GTE Sw., Inc. v. Bruce</u>, 998 S.W.2d 605, 611 (Tex. 1999) (internal citations omitted).  Ordinary employment disputes are not sufficient to state a claim for intentional infliction of emotional distress.  Only in

28

the most unusual of circumstances does an employer's conduct move "outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct." Id. at 613.

Because Mosley has failed to proffer any summary judgment evidence that any Defendant's conduct during the investigation into the theft and subsequent grievance hearing was of such an extreme and outrageous nature as to remove this case from the realm of ordinary employment disputes, Defendants are entitled to summary judgment on Mosley's intentional infliction of emotional distress claim. *See* Diamond Shamrock Ref. & Mktg. Co. v. Mendez, 844 S.W.2d 198, 202 (Tex. 1992) ("[F]alsely depicting [employee] in the community as a thief" is insufficient to constitute outrageous behavior).

C.   Claims Against Roadway

   1.   Retaliation Claim against Roadway

Mosley also claims that Roadway terminated him in retaliation for Mosley filing grievances and obtaining reinstatement after his two previous discharges.   Mosley's retaliation claim against Roadway fails for substantially the same reason as his discrimination claim.   Retaliation claims under Title VII, like discrimination claims, are analyzed under the McDonnell Douglas burden-shifting framework. *See*, *e.g.*, Davis, 383 F.3d at 317 (5th Cir. 2004).   Even if Mosley could establish a *prima facie* case of

retaliation, his claim fails because Roadway has proffered a legitimate, non-discriminatory reason for firing Mosley, and Mosley has failed to offer any evidence showing pretext. Accordingly, Roadway is entitled to summary judgment on this claim.

2.   Hostile Work Environment Claim against Roadway

Mosley's other discrimination claim, based on a racially hostile work environment, requires Mosley to prove that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his race; (4) the harassment affected a term, condition, or privilege of employment; and (5) Roadway knew or should have known of the harassment, yet failed to take prompt remedial action. *See* Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 353 (5th Cir. 2001); *see also* Felton v. Polles, 315 F.3d 470, 484 (5th Cir. 2002). To be actionable, the challenged conduct must be sufficiently severe or pervasive to alter the conditions of Mosley's employment and create an abusive work environment. Harris v. Forklift Sys., Inc., 114 S. Ct. 367, 370-71 (1993). Whether the harassment is sufficiently severe or pervasive is based on a totality-of-the-circumstances test that focuses on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance." Turner v. Baylor Richardson Med. Ctr., 476 F.3d

30

337, 347 (5th Cir. 2007) (quoting <u>Walker v. Thompson</u>, 214 F.3d 615, 625 (5th Cir. 2000)); *see also* <u>Harris</u>, 114 S. Ct. at 371.

Mosley does not defend his hostile work environment claim in responding to Roadway's motion for summary judgment.  Rather, in the conclusion of his response, he cursorily asserts that he "was placed in a hostile work environment."  He presents no evidence, however, that he was subjected to unwelcome harassment based on race, or that any alleged harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of his employment.  Accordingly, Mosley failed to raise a genuine issue of material fact that he was subjected to a racially hostile work environment, and Roadway is entitled to summary judgment on this claim.

3.   <u>Defamation and False Light Claims Against Roadway</u>

Mosley asserts that Roadway defamed him and portrayed him in a false light by wrongfully accusing Mosley of stealing the trailer and lying about his participation.  Document No. 18 at 11.  Roadway moves for summary judgment on Mosley's claims asserting that (1) Texas does not recognize the tort of false light,[6] (2) Mosley's defamation claim is preempted by the LMRA, and (3) even if the defamation claim is not preempted, Roadway's statements about

---

[6] Roadway is correct, Texas does not recognize the tort of false light.  *See* <u>Cain v. Hearst Corp.</u>, 878 S.W.2d 577, 579 (Tex. 1994).  Thus, Mosley's false light claim is dismissed.

Mosley were protected by a qualified privilege and Mosley has no evidence to show that Roadway acted with actual malice.   Document No. 32 at 18-22.[7]

Apart from the LMRA preemption defense, which need not be considered, "[t]o maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998).  However, "[a]ccusations or comments about an employee by his employer, made to a person having an interest or duty in the matter to which the communication relates, have a qualified privilege." ContiCommodity Servs., Inc. v. Ragan, 63 F.3d 438, 442 (5th Cir. 1995) (citing Schauer v. Mem'l Care Sys., 856 S.W.2d 437, 449 (Tex. App.--Houston [1st Dist.] 1993, no writ)).  The qualified privilege must be pled

_____

[7] Local 988 and Williams also move for summary judgment based on Mosley's defamation claim, apparently assuming that Mosley was making a defamation claim against them as well as against Roadway. Document No. 30 at 21-24.  The defamation claim in Mosley's Amended Complaint, however, specifically mentions only "Defendant Roadway." Document No. 19 at 11.  Assuming that Mosley did assert defamation claims against other defendants, however, they would fail for the same reasons as the claim against Roadway.

as an affirmative defense.[8]   *See* id. at 443.   If the employer
proves that the privilege applies, the employee may overcome the
privilege only by proffering specific evidence proving the employer
acted with "actual malice."   *See* id.; Reed v. Chevron Pipe Line
Co., 84 F.3d 432 (5th Cir. 1996).

     The summary judgment evidence shows that any statements made
about Mosley's involvement in the theft were made between Roadway,
union representatives, and Olivarez, all of whom had an interest or
duty in determining who was responsible for the theft.   *See, e.g.*,
Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 646-47 (Tex.
1995) (finding that all supervisors, managers, and the security
guard that heard that the plaintiff had walked out with merchandise
without paying for it had an interest or duty to investigate the
matter).   Mosley has failed to proffer evidence that any statement
was made to anyone else.   Thus, Roadway is entitled to qualified
immunity, and, therefore, Mosley can survive summary judgment only
by showing evidence that Roadway made false statements about him
with actual malice.   *See* ContiCommodity, 63 F.3d at 442.[9]   Because
Mosley has proffered no evidence showing that Roadway acted with
malice, Roadway is entitled to summary judgment on this claim.

---

     [8] Roadway invoked the qualified privilege defense by pleading
it as an affirmative defense in its Original Answer.   Document
No. 10 ¶17.

     [9] Actual malice means making a statement either (1) knowing
that it is false, or (2) with reckless disregard for whether it is
true.   Carr v. Brasher, 776 S.W.2d 567, 571 (Tex. 1989).

III.   <u>Order</u>

Accordingly, it is

ORDERED that Defendant Teamsters Local Union No. 988's and J.D. Williams's Motion for Summary Judgment (Document No. 30), International Brotherhood of Teamsters's Motion for Summary Judgment (Document No. 31), and Roadway Express, Inc.'s Motion for Summary Judgment (Document No. 32), are all GRANTED; and Plaintiff Christopher Mosley's claims are DISMISSED on the merits.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 17th day of April, 2009.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE